1244-50, 1244-581, United States of America v. Leslie Sadler, Nancy Sadler, oral argument following, 10 minutes for the defendant, 20 minutes for the plaintiff. Mr. Leibniz, Mr. Brown, for the defendant. Good morning, your honors. May it please the court, Robert Dietrich for Mr. Lester Sadler, if I may reserve four minutes for rebuttal. The government need not present proof that disproves any reasonable hypothesis of innocence. But it must present evidence that offers something more than a reasonable hypothesis of guilt. To honor the Jackson standard and to give effect to the presumption of innocence and society's expectation that there's going to be some due process associated with criminal processes that end in prison, I think we need to give every word of the Jackson standard effect. Whether based on the trial record evidence, a rational jury could find guilt beyond a reasonable doubt. Where is that line, that Jackson line, and how is that differentiated from the no evidence standard that preceded it? It's murky. But I submit to you that in this case, as to Mr. Sadler, the government fell down for two reasons. One, because it failed to link its evidence to Mr. Sadler. And two, because the co-conspirators, the people who are actually committing the crime, didn't act as if Mr. Lester Sadler was a member of their conspiracy. And because of that, the conviction for Mr. Sadler is based upon impermissible speculation. He said they didn't act, though, as if he were a member of the conspiracy. That's not what the statute requires. I mean, is it? I think, is it required that they act? No. But could a reasonable jury find that when all the members of a conspiracy act as if a certain person is not a member? I don't think a rational jury could find, under those circumstances, that that person is a member of the conspiracy. And I think that's the point. You know, one of the prosecutors in my old office used to give a great speech about this. I used to say, you know, if you could, and forgive me, I was in the Eastern District, Tennessee, and this is back when we had Fulmer, you know, he said, if you could listen to the talk radio shows and find out what's going on with the Vols, or you could have a microphone in the huddle and when Fulmer talks, which would you rather have if you wanted to know what's really going on? And that's the situation we have here. You know, we can pull this back 25,000 feet and anybody could be a member of this conspiracy. And I think that's what the government tried to do here. But if you actually look in the huddle and listen to what the captains are telling the troops, nobody's communicating with Mr. Sadler. You know, when they run into trouble with the law, nobody calls Mr. Sadler, despite the fact that he's his brother-in-law, that he's known him for his entire life, that they're good buddies. They call Nancy Sadler. It's to the point of exclusion. You're saying Lester just had stuff related to the, I mean, he was doing stuff with the clinic. Oh, sure. I'm not suggesting by any means that he did not. What about on the legitimate side of the clinic, paying the bills and so forth? I don't know there's any evidence that he paid the bills. I mean, I think there's evidence that he was on accounts from which bills were paid. But I don't know if there's any evidence that Mr. Sadler was paying the bills. And, you know, I invite the court to look through the PSR and the nature and the characteristics of Mr. Sadler and conclude for yourselves whether you think that Mr. Sadler is a person who would be a detail-oriented person. I don't think that if you look through his personal characteristics that that's something. Wasn't Lester Sadler the one that neighbors complained to about, you know, what was going on in the parking lot before the clinic opened? The government has suggested that. But the record trial evidence only shows two instances in which people complained. And it's not clear whether they complained to Mr. Sadler or not. But even if they did, there's no record evidence that it contained the level of detail that the witnesses came in and testified to about what they were experiencing with their businesses or that the lease company was experiencing. The evidence would show that Lester Sadler would have seen this every day he came to work. Would have seen what was going on in the parking lot, the number of people coming from all over. Well, I mean, he would see that there are people in the parking lot. I don't know that he would have been out in the parking lot inspecting what's going on. And there's no record evidence that he did. And the government's, you know, wonderful evidence. Well, hadn't she been prosecuted before for some of this? He knew that. Presumably. Presumably. Well, how could he not know it? And now here they are in the same business again. It seems unlikely that he would assume that everything was on the up and up. I understand that assumption. And it's an assumption that, you know, in my life experience that I probably would want to make too. But I think if we look at the trial. But couldn't a rational jury make that assumption? I don't know. I don't think that under these circumstances they can. And I'll give you a whole list of reasons why. For example, you know, Nancy lied to her sister to get her sister onto the incorporation papers. You know, she was signing things, you know, under the government's theory as Marie and Maria. There was no Marie and Maria there. There's no evidence that Mr. Sadler ever knew of a Marie and Maria there. You know, when Mr. Sadler, Mrs. Sadler, according to the government's evidence, was splitting the proceeds of the drug diversion with David and Michael Journey, there's no record evidence that Mr. Sadler was aware of that at all. You know, I sort of akin this to a case where there's infidelity in a marriage. People see what they want to see, you know, and there's no record evidence that connects Mr. Sadler to the knowledge that Mrs. Sadler had under the government's theory. On that point, people see what they want to see. I mean, in here where things, you know, objects of this conspiracy are ongoing and he is there, you know, day in and day out, if he chooses not to see, if he exercises willful blindness, he can't really rely on that to extricate himself from this. And I know you say he's not in there, but, I mean. Judge Arnold, I think that's a great point, but I think if you actually look at the structure of the clinic, that answers the question. The people who were involved in the conspiracy were involved in the medical sphere of the clinic, and there's no evidence that Lester Sadler was involved in the medical sphere of the clinic. In fact, the only other employee who was there, other than David and Michael Journey, who admitted that he was diverting pills and splitting the proceeds with Nancy Sadler, was the defendant who was acquitted in this case. Weren't they both convicted? I'm trying to remember now. They were both convicted of maintaining premises where this was going on. Isn't that correct, or am I using this case? Nancy Sadler and Lester Sadler were, but the co-defendant, there were three defendants in this case, one of which was convicted, the receptionist, who was not involved in the medical sphere. Well, I'm not talking about the medical sphere. Well, maybe I am. I'm talking about just the operation of the business. Well, if you talk about the operation of the business, the receptionist was the one who would actually take the money from these purported patients, which is something the government says about Lester Sadler, that at the end of the day, he took the money that the receptionist got and counted it. I think this is another important point. There's a lot of talk about how the— Do you have a case where it's such a small business? For you to be right, because Lester owned this thing, you have to have a case where the owner gets off, there's not sufficient evidence, but the other people—this seems remarkable to me, particularly maintaining a drug premises. For the owner to get off, there'd be at least lots of hints that something's amiss, prior investigations, and the owner gets off, and the people technically below the owner don't. It seems wild to me. I think that this is a little bit distinguishable, because there's more than one owner here, and there's one owner who's in the medical sphere. He owned Ohio Medical. He owned Ohio Medical. Right, right. Okay? Wasn't that one of the key clinics? Right, right. Give me a case where that happened, where someone said, hey, as a matter of law, we find insufficient evidence as to the owner, but sufficient evidence— I think RUFAI, from the Fifth Circuit, that I submitted in my Rule 28J letter. Remind me how to spell that. It's R-U-F-A-I. Okay. It's probably the best case that I have in that regard. Is it a small operation? Very small. It was a Medicare fraud. In fact, the entire business was a fraud. Although the owner got off on the underlings, there was sufficient evidence at the court of appeals. Well, in that case, there were two defendants in that case, and there was a third guy who was in the conspiracy who the government had convicted earlier of a broader Medicare fraud scheme. And the Fifth Circuit found that this owner of a business was not culpable because of sufficiency of the evidence, whereas the other owner who had previously been— Hey, listen. Two owners. I mean, this is the top. I mean, I don't think a lot of defense lawyers in this area get up and, in closing, exclaim, but he was just the owner. I mean, it just seems really strange to me. Right. I think if you look at the trial record evidence, I mean, I understand that he is the quote-unquote owner, but he doesn't act as an owner of— No scare quotes needed. He's the owner. That's the way the law treats this. Right, but that's not what's required for either of these convictions. I mean, the fact that he's the owner of a business does not bind him to conviction. It's a practical point. It is. It's a practical point, but this was a business that was operating as a facade. The government's own expert, the nurse, came in, and she testified that the records appeared in order. When he talked to doctors, the doctors, knowing how they were treating patients, never said to him, hey, there's a problem here. Well, I think you've gone pretty well, but you've been answering our questions, so you get your full rebuttal, but we'll hear from your co-counsel. I guess it must be Ms. Sadler's counsel. Good morning, Your Honors. My name is Will Brown, here for Nancy Sadler, and may it please the Court, reserve two minutes for rebuttal at the end. This case, with regard to Mrs. Sadler, presents two sets of issues. One, the evidence against Mrs. Sadler is insufficient. It's a matter of law to support the convictions for maintaining a drug-involved premises for reasons very similar to what Mr. Dietrich was talking about. There's no proof that Mrs. Sadler was running the clinic, the place, under the meaning of the statute, for the purpose of distributing illegal drugs. And then, with regard to wire fraud, because there's no proof that she or anyone else deprived any party of any money or property, deprived by the statute. On this deprivation of property point, which interests me a little, have you done much searching around the other courts of appeals on this, in terms of other cases? Yes, Your Honor. The closest case to this that I was able to find was a Tenth Circuit case. It was Stewart. It's an older case. It's 1989. So is it before the amendment? So that makes it post-McNally and post-the amendment that gets us back on the services. Is the Tenth Circuit case a case in construing the present language? I believe so, Your Honor. Okay. What happened? Do you remember what happened? Stewart, the deal there was, it was a medical supplier, medical distributor, who was buying... What was the government's theory of deprivation in that case? The government's theory of deprivation in that case, which the court wound up upholding, was that the medical supplier had two different prices that it charged for pills, depending on if you were going to resell them to a for-profit hospital or a non-profit hospital. The defendant had represented that he was selling to a non-profit and got a lower price, when in fact he was selling for a higher price. And the theory was that their deprivation was the difference, was the delta between the higher price they would have gotten if they'd known what he was really doing with the pills and the lower price that they charged. You're probably mentioning in that case that that wouldn't be true here. Correct. Okay. How about any cases that kind of show that when you pay full price, no matter what the other illegalities are, the other bad things happening, it's not a deprivation of property, whatever else it is. I haven't been able to find anything directly on that point, I think because it strikes me as maybe novel or too obvious to have wound up in front of a court that if a business sells something that it normally sells in the course of its business and gets full price for it, it hasn't been deprived of anything. So this really kind of brings it back to these two convictions really are resting on general accusations of all the wrongdoing that's going on in the clinic and not on proof of the specific elements of these two offenses. And then the second set of issues are with sentencing, where Sadler's sentence is based more on the criminal acts of others, David Michael Cherney in particular, on district courts, recent experience with other pain clinic cases, very different facts than the one that was actually before it, on acts that the jury had acquitted Mrs. Sadler. So you're allowed to use drug quantities where people are participating if it's a conspiracy or some joint enterprise, right? Correct, Your Honor. The point here was that there were really kind of multiple conspiracies going on inside the building and outside the building of Ohio Medical. And the proof was that Mrs. Sadler was involved in one of those, in the conspiracy to order some of these pills directly from drug suppliers and sell them to Mr. Cherney. The most direct evidence on that one is a couple of isolated transactions where she orders something like 40,000 units of hydrocodone, sells it to Mr. Cherney for $20,000. That's the same transaction that's at the root of the money laundering account that we're not contesting here either. But then you have the other conspiracies. You have Mr. Cherney's schemes to get pills in other ways that don't involve Mrs. Sadler. He was buying prescriptions directly from Dr. Banks. No proof that Mrs. Sadler knew anything about that. Can I ask you a question? Sorry if I'm getting this wrong, but I think I've got it basically right. Just say for the sake of argument, you're right on the wire fraud, but sadly wrong in everything else. What does that do to your client? I mean, weren't there like three concurrent sentences? Correct. So would it affect? The fact that there were three concurrent sentences, is that just the end of the story? That just means, well, it would still be important. You'd obviously not have that conviction if that were true. But in terms of sentencing, it would not require resentencing or it would require resentencing? As a practical matter, I mean, it wouldn't reduce the effect of sentence. So there's really not much to do. You just vacate the conviction. Vacate the conviction, which would be important just from a structural perspective. We need people to only be convicted of the things that they actually did. And then on hypothetical in future, there seems to be movement on changing drug sentences. Sometimes retroactively, there doesn't seem to be the same kind of pressure when it comes to wire fraud sentences. So if that conviction stays in place and anything changes on the drug sentencing law, you could wind up with a situation where the wire fraud sentence is now controlling and is the reason why she's stuck in prison. So I'd be interested to go back and look at all the sentencing calculations, but there's just no way it would change the calculations for the other counts? I don't believe so. The one part of it that does dovetail into something that could change the calculations for other counts is this notion of defining the scope of the conspiracy that she was actually, the scope of the wrongdoing that she was actually involved in, which if that's really just the ordering of pills from the drug suppliers, which is the only part of the conspiracy I would really characterize as a separate conspiracy, that she was involved in. From the other stuff, from the phantom patient stuff, where Mr. Gerney was fabricating patient charts out of whole cloth, fake MRIs, fake x-rays, all this good stuff, and then filling those prescriptions and selling them, the jury acquitted Mrs. Sadler of 24 counts, every count that involved conduct like that. It doesn't appear that... I don't know if this is more harmful to your client or Mr. Sadler, but one of the worst facts in this case, at least to me, was this Dr. Brenda Banks work there and just was blowing through all the records in terms of prescriptions or just dosage units. I find myself saying, how could one not know about all this? That comes back to the... So obviously Banks was misbehaving. Correct. That goes into the medical practices case the government had built against Dr. Banks and had volumes of evidence about her unethical... What was the end of her story? Was she convicted? She pled guilty to a lesser offense on the eve of trial, which left the prosecution with this mountain of medical practices evidence and no doctor to try. They went on and put on most of it over defense objections and muddied the waters about who exactly was doing what, was responsible for what illegal conduct and what bad conduct in the clinic and pretty successful in just getting... On a given day, how many employees were at the clinic? Just employees, not patients. Off the top of my head, I don't know. Was it like 3 to 5 or 5 to 10 or 5 to 12? Counting on my fingers, I can think of, it's 5 or 6. It's not very many. It was a fairly small operation. Definitely more pills than people. Correct, Your Honor. I see my red light. All right. Well, thank you. You'll get your rebuttal. We'll hear from the government. Thank you. May it please the Court, Tim Mangan on behalf of the United States. What do you think about this wire fraud? I'm really struggling with that one. Sure, Your Honor. The essence of the claim that they're making is that, well, the nature of the offense didn't really deprive the drug company of any property or money. What we would point to is... They paid full price, right? Because they paid. What we would point to is, by analogy, if you look at a mortgage fraud case, for example, somebody lies to a bank in order to obtain a loan, if they're prosecuted down the road, it doesn't matter if there was a loss. It doesn't matter if they were current on their payments because they deprived the lender of the ability to control its own risk. In the case that we cite... That's a great analogy in one respect, but what they'd be prosecuted for there would be lying on the loan application, right? Or it could be bank fraud. I mean, it could be a fraud case, not just a false statement case. But, I mean, I guess what I'm trying to figure out with this analogy, how you analogize it to depriving someone of property. I mean, if... So take... This is a... I think it's a good example. So you've lied on your application, so that's a false statement. You should get prosecuted for that. There are probably some other bad things you've done. But if, in the course of the loan, you follow the terms. In other words, in terms of the economics of it, they say pay $1,500 a month for 30 years. You pay $1,500 a month for 30 years. You pay the whole thing off. I don't get how you'd have a deprivation of property problem there. You would have false statements. You'd have a perjury problem. Yeah, perjury. You'd have all these other things. And that's, I think, what's going on. Well, my first instinct is to think that's what's going on here. Yes, they were doing lots of other bad things, and, indeed, they got convicted for lots of other bad things. I just don't see the word deprivation of property applying to this. Well, Your Honor, I think first, kind of sticking with that analogy that we're discussing, I think there are cases prosecuted. I don't have one to cite to you, but that would be a fraud case that ends up having no loss. Same way it could be, at least for banks, financial institutions. Could it be a wire fraud deprivation of property case? It can be a wire fraud case. Give me a case that does that. Let me point to the Daniels case that we did cite. It was a little bit different because it ended up looking like more of an embezzlement case, but it was an individual who was using company money to further other transactions within securities. And the argument at the end was I had no intent because, as things went well, he was using company money to cover margin calls. He said, you know, I was paying the money back and I was intending to cover the money back. So it was a little bit similar, but the argument in there was, look, there was no intent to deprive anybody of property. Did he pay everything back in Daniels? At the end, I think when the wheels stopped turning, there was a loss. But the point was the argument, though, about intent, what the Sixth Circuit said in that case, though, was that what you were doing was you were still depriving them of the ability to control their own risk, and that's really what you're doing in these types of cases. I guess I'm just struggling with why... I'm not even sure I understand why intent has anything to do with it. Maybe you can help me with that. The intent was the argument in Daniels. I'm trying to draw the analogy. I'm trying to tell you I don't understand how intent has anything to do with the phrase deprivation of property. That's what I'm struggling with in this case. Just as to those words, if you didn't deprive, I don't care if your intent was good or bad. I mean, Mother Teresa or Jimmy Hoffa, if you either paid it, either the economics of it were what you said you'd do or they weren't. What I would say, Your Honor, is I think there's a lot of cases where that might... This situation simply wouldn't come up. I think why it's coming up in this particular case is if you think about the product we're dealing with, they're not buying widgets. They're buying a product that a consumer cannot buy. This is not something that somebody can walk in and get or get a relationship with a drug distributor. You need to follow protocols. You need to have a DA registration. The reason they're called controlled substances is there is a very rigid regulatory scheme for the distributors so that they know who they're selling to and on the buying end and for them to set up a complete... Let's imagine an even more brazen scheme. It's just buying heroin or whatever. It's just two people violating the law. In the course of that, you're not going to worry about deprivations of property. You worry about a lot of other things, but you're not going to worry about deprivations of property if everyone's getting what they say they're... One side's getting what it says it wanted and the other side's getting what it asks for in return. This isn't something where a drug distributor would sell to anybody who comes in off the street. The drug distributor has the ability, and it should be scrutinizing, who it sells to. Here they obtained drugs through deception, through a scheme to defraud. That's what they deprive the drug distributor company of. Deception, excellent cause of action. I don't know how that's deprivation of property. It's still a scheme to defraud from the standpoint of... Obviously, the language in 1343 also talks about to obtain through false pretenses and things of that nature. It's easy to throw it under the lump of a scheme to defraud because that's a colloquial term. But we're still talking about lies to obtain something that you're not entitled to obtain. The fact that they ended up sending in the check later shouldn't change that. I want to address counsel's argument that the record is devoid of evidence which shows that Mr. Sadler knowingly joined in this conspiracy or that anybody treated him as a member of this conspiracy. What's the record evidence that establishes his knowingly joining the conspiracy? There's actually quite a lot, Your Honor. You don't have to give me all of it, just some. Right. First of all, there was a mention that, well, he wasn't involved in the obtaining of pills directly from the distributor and this whole scheme to have a Marie and so forth. I'd point the court, just for example, to Exhibit 28, page 52 and 54, where Lester Sadler is writing a check. His signature is on the check paying for these pills. There's no reason for this clinic to have these pills. Everything about the pills was fraudulent, from how they obtained them to what they did with them. Really, anybody connected to that who understands what's going on... Let me just stop you there just to make sure you're grasping that. There's no reason the clinic should have pills because all the clinic has the right to do is have a doctor who can give out prescriptions. The doctor with the DA registration can order pills for certain uses with the patients. And keep the pills at the clinic. Right, but the undistributed evidence was that patients never got pills. That's why I'm saying the pills came to the clinic and then were used otherwise. They were given out, they were sold on the street, so forth. The patients, meaning the customers who came in each day, didn't get pills. They got scripts. So that's why I'm saying it was legitimate in Holt in terms of the ordering of pills. There were numerous schemes that were going on, I agree. There were multiple conspiracies within there. One was how they handled the patients off the street in terms of giving out scripts for no legitimate medical purpose. But then secondarily, we have a lot... Prescription, yes, I'm sorry. I've adopted some of the horseman language. So there were multiple conspiracies. With respect to the ordering of the actual pills, which a lot of these clinics didn't engage in this conduct. But that was the problem with this particular clinic in the ordering of the pills. They were diverted almost immediately. They were actually ordered under Dr. Bank's number. She wasn't involved in the ordering. And they were kept under lock and key in a safe that Lester Sadler had control of and Nancy Sadler had control of, but the doctor didn't have access to. The doctor's only connection to these pills was when she was dope sick, and they would actually give her pills to help keep her under the influence while she worked there. And there's testimony in the record. This is how it operated. Nancy Sadler was telling people, go take some of the hydrocodone down to Dr. Bank's just to kind of keep her going. I'll also point out, so there was a comment that there's no connection of Lester Sadler to writing the checks, he's just on the accounts. No, there is a check, and it's actually one for the pills. There was also a comment that he didn't know that Nancy was doing this whole false thing about Marie. All of the records, the vast majority of the records that we had on this Marie scam and about these pill orders were found at the Sadler house. And there was also a black bag found on the Sadler's bed. And the witnesses testified that that's the bag that Lester Sadler would take back and forth. And he was the guy who kind of shuttled between more or less the home office and the clinic. That's the bag that he carried. And in it is Exhibit 82 and 82A, which is an envelope and a letter to Marie Myers. So Lester Sadler is not just... I think at one point, Your Honor, you talked about, was he just involved in the legitimate side of the clinic? There was no legitimate side to the clinic. He was involved in setting the quota for how many patients had to be seen. He set that quota. He collected the money and the documentation to make sure that they were seeing enough patients. The biggest part of the scam with respect to the patients off the street, we did have evidence about the neighbors complaining and all the atmosphere, I'll call it. But there was also a very serious part of our case about what we called the day sheets. These were sheets that were filled out for every patient to document that they came in. And the idea was for it to look like they had a real medical exam. But to fit the volume that they were doing, 40 was the minimum. They did 70, 80 patients a day sometimes. To do that kind of volume in that period of time, they had to really spin people through. And so they wrote the forms out in advance. And those were written out at the Sadler House. And then Mr. Sadler would transport them in to the office. And they needed those forms to justify, what, the amount of pills they were ordering? I think it was to create some documentation of the patient visit. The problem was, one of the problems was, they started filling these out in advance.  I'm trying to figure out what... Just give me a minute. They're filling out the forms. The patients come in. They give the patients a script. And what do they get out of it? A fee for having seen the patient? Yes, usually $150 per person. Okay, got it. Right. So multiply $150 cash by 50 to 70 people a day, every day. And that's the cash business that they operated. Was it cash only? Yes, wasn't it? 99%, I would say. Were they insisting on that? I'm trying to figure out the point of the cash. What is that? You're making it sound incriminating, and maybe it is. I'm just not sure I understand. Well, I think it was somewhat the nature of the business that none of these folks didn't have insurance or the insurance might not cover it. But I think, to a larger extent, they did not, meaning the clinic did not want to deal with what goes along with submitting health insurance claims. This was easier. I got it. You have to obviously register as a provider. You have to fill out a lot of documentation to be a provider with a health insurance company. This was much simpler. The reason I say not everybody, Your Honor, was there were a couple people who were more or less friends of Sadler's who would come in with their own insurance plan. But the vast majority were paying cash. The importance of the day sheets, though, was this is where they filled out what the person's complaint was. This is where it had the vitals. And they were making up the vitals. They would make it up days in advance. Because when the agents did the search and searched the Sadler's house, they found a week's worth of day sheets created in advance, which were highly incriminating and, I think, exposed the illegitimacy of the practice of the clinic as a whole. And so that's why it was also important, the testimony later in the case, when Connie Wright, who lived with the Sadlers, lived at the house and also worked with the clinic, testified about when, in a hurry, Lester Sadler and others were out there burning day sheets at the Sadler house. So that's how a lot of this fit together. So going back to your original question, Judge Donald, Lester Sadler was involved both on the pill ordering side of it, which was illegitimate in its own way. He was also involved in just running the clinic and the illegitimate prescriptions that were given out to the patients who came in on a day-to-day basis. Lester was really the individual who oversaw that part of the operation. I think they're correct. You would see about six people in there on a given day, somebody at the front desk, three assessors who had to kind of finish the paperwork and get them in to Dr. Banks and so forth. But it was done in very much sort of a factory form. I do want to go back to a couple points. I believe, Judge Sutton, you asked about what would the impact be of the wire fraud count. I do want to get back to that part of it. There were four consecutive sentences for the same amount given to Ms. Sadler, so there would be no need for resentencing. In addition, if you look at the PSR, the guideline calculation, they treated the wire fraud as completely grouped and subsumed within the drug count. There wasn't even a separate sentencing guideline analysis done under the wire fraud, which calculated loss and things like that. It was grouped within the drug sentencing guideline under 2D1.1, and then they went from there. I would support the wire fraud count, first of all, but I did want to address the Court's question about what would the impact be, should you not find in our favor. I think it was important for us to perhaps emphasize the nature of this product here. It's important for the distributors to control their own risk. In this case, they lied on the front end. They lied as they ordered, both by creating a fake person but also not even having the doctor involved. Then they actually lied on the back end. There was testimony about certain letters that were given to the distributors because some of the distributors, GIV came back and said, wait a second, what are you using these for? They were concerned about the volume. There was a false letter that was created by Nancy Sadler and submitted. That's the thing that strikes me as really undermining the drug distributor's right to deal with honest people. They would have the information to know that this little clinic is blowing through all the charts. I feel like it just doesn't make any sense to me. There is a difference there. Let me make sure the court's not confusing two things. The number of patients coming in on a daily basis is not available to the drug distributor. But the dosage units of this Dr. Banks, what were they thinking? They have the information, or was there so many distributors involved each wouldn't know what the other was doing? There were two distributors involved not knowing what the other was doing. There's a second point. This was in the all-scripts testimony. They did a form to open up the clinic's account. They represent how many doctors are there, how often are you open? They lied on it. Nancy Sadler lied on it. She said we've got two doctors, we're open five days a week to distort the volume, or at least try to distort that for that particular distributor. That was part of the testimony. I think one of the defense attorneys tried to say, well, that doesn't matter to you. She said, no, it does matter. This is a concern for us. If you say there's two doctors and there's only one. The same thing about how many days you're open. Because from a regulatory concern, and this is what she said, that is a concern for us. If the distributors wanted to sue them, there would be causes of action under state law for deceptions, fraud, lies, I just don't think deprivation of property is a phrase that works with what happened. If we're talking about obtaining property by false pretenses or any of that other language in the statute, we're still talking about obtaining something you're not otherwise able to get without that lie. Are they in a position, the distributors, they're regulated, I assume, federal regulations. As controlled substances, they fall under that. Right, so does somebody come in and check their records periodically and say you're supplying too much to this little clinic, you're in trouble, we're going to snap your license or whatever it is they have that permits them to do that? Isn't the answer the government investigated some of these distributors and they were very big settlements? All of those have happened. It's not part of the record in this particular case, but that can happen. That is the risk that they're bearing because they have to report. The way the government knows who's ordering from whom is the reporting systems that are done. Obviously, through data analysis, there can be some investigations that are launched from that standpoint. Okay, I think we understand your argument. Unless you had anything else to say. Unless the court has any questions about the drug quantity issue that was raised by Ms. Sadler, I did want to make sure it wasn't confused in that this was not acquitted conduct that was used. In fact, we intentionally did not use the quantities that were alleged in the indictment and that were subsequently acquitted. It was a similar structure that was used. There were phantom files created for both the Journey family and the Sadler family. And the Sadler family ones, which were not part of the acquitted conduct, were used by the court at sentencing. I just wanted to make sure there wasn't any confusion because it was not acquitted conduct that was used. The court used members of the Sadler family and there was testimony in the record that there were fake files created for those members of the family. By the way, this dovetails into the question about Lester Sadler as well. With respect to these phantom patients that are created, these phantom files, there was Mrs. Sadler's mother who lived at the house. She had a fake file. Their son, Kyle, had a fake file. Lester's father, James, had a fake file. He was the one who picked up the pills and then brought them back for Nancy to then use and sell. So it still comes back to Lester understood what was going on. We got the argument. Thank you, Your Honor. We appreciate it. Is there a rebuttal? I'll follow up on that. Lester had a fake file. But the fact of the matter is that the government has not put in any evidence that connects Mr. Sadler to any of this. And I think it's a fair inference for the jury that if the government had that evidence with all the brother-in-laws, the sisters-in-laws, these good friends and buddies, if the government had that evidence, it would be in the record. And it's not there. And the government continues to go down this path where they say, you know, hey, look, he signed some checks. It doesn't say that they were signed for pills. He signed checks. And it's not even sure that he actually signed the checks. If you look at Exhibit 81, Record ID. Is there not a check in there where he's paying for pills? It's not like these checks say for pills in the notation. I know, but does the evidence, you know, it's a jury verdict. They get the inferences. Is it fair to say there's a check he signed that the jury could infer was to pay for pills? Well, I think the jury could infer that there was a check that bears his name that was used to pay pills. But pay a supplier. Not necessarily for pills. It doesn't say pills on there. But it was a drug distributor? These were not just drug distributors. They were also supply distributors. So it's not just pills there. Milk and eggs and soda, though. Right, no, but they're providing charts. Back to the jury. Back to the inferences we're allowed to give the jury verdict. Isn't it fair to say that the evidence, a jury could conclude from the evidence he signed checks that were paying for pills? I'm asking for inferences, not technically what is on the check. Inferences. I don't think a rational jury could get there. If you look at Exhibit 81 and Record ID 217, page 1618, there's evidence that Nancy Sather was signing Lester Sather's name to various documents. There's evidence, you know, and I understand your point, but this is not evidence that's written on Tabula Rasa. You know, the jury has to view the whole picture, and there's evidence that Mr. Sather deliberately... Plus the black bag and what they found in the black bag. There's absolutely no evidence that Mr. Sather was ever involved in day scripts. Lots of people testified about who was involved in doing the day sheets. Mr. Sather was never included in that group, even if that was the wrong thing to do. I mean, I concede maybe it's not a best practice, but... Wasn't incriminating evidence found in the black bag that he carried back and forth? Sure. What's the theory? Someone else put that in there? Is it permissible that that shows he was involved in this? Couldn't a jury infer that? A jury could guess that he opened up the black bag, went through it, read every document, and then figured out what was going on. But I think that stretches Jackson too far. How about the jury inferring he created the sheets himself? There's no record evidence for that. Repeatedly, the government went through witnesses and asked who was involved in creating the day sheets, and every witness consistently did not identify Lester Sather as being one of those people. How about the inferences about quotas, his setting quotas? There's no record evidence that the clinic ever had a problem meeting 40 patients. But beyond that, when Lester Sather was interviewing Dr. Duncan, he told Dr. Duncan, my expectation is that you're going to see at least 40 patients a day. Dr. Duncan goes to court and testifies that he thinks that's a large number. But he didn't tell Lester Sather that. Instead, he said to Mr. Sather, great, I'll take the job. Why is Mr. Sather supposed to think that 40 patients... So 40 is a lot? No, the only evidence about 40 being a lot comes from Dr. Duncan testifying at trial. There's no evidence that Mr. Sather appreciated at the time that 40 patients was too much at the time. That would be great evidence if it was in there, and if the government had it, I'm sure it would be in the record. If there was any evidence that David Michael Jurney had a conversation with Lester Sather about any of his drug diversions, I bet you that would be in the record. He was cooperating. He got virtually no time. It's not in the record. He was his brother-in-law, knew him for his entire life. You know, Lisa Clavenger testified that her name was on lots of orders that she was unaware of. She's Nancy Sather's sister. That's at record ID 1651. We'll go over the record carefully. But I think my overarching point is these people... That was actually a hint. The red light's been on for a little while. Oh, I'm sorry. So just if you want to make one more point, that's great, but I wanted to make sure you saw it. I appreciate that very much. My closing point is the conspirators in the medical sphere of this case were very adept at doing what they did and hiding it from their loved ones, including David Michael Jurney's wife. And there's no record evidence to tie it to Lester Sather. And I understand that, you know, he was a nominal owner and there's a guttural instinct to try to hold him accountable, but I would recommend to you and urge you that a criminal prosecution is not the right venue for doing that. It's too clumsy. If he's got civil liability, then that's how it should be pursued. Thank you. Thank you. Thank you. Coming back to your question about the sentencing effect on a potential reversal on a wire fraud conviction that was also discussed, I don't mean to concede a point completely here. I don't know that a reversal on wire fraud would change the guidelines calculation. I mean, the sentencing didn't roll through a separate calculation for an amount like you would normally see on wire fraud because there wasn't a loss here, I would imagine. But it could affect a court's analysis of the sentencing factors under 3553. If you lose that count completely, then the picture changes somewhat and so it could change the court's analysis of 3553 at a new sentencing hearing. Then with regard to the drug quantities, whether this is specifically acquitted conduct on the phantom patients or just otherwise kind of unconvicted conduct, the picture we get from the jury verdict is that Mr. Sadler was convicted of the conspiracy to order all these pills from the drug suppliers and sell them to Mr. Journey, not so much the phantom patient stuff or the buying prescriptions directly from Dr. Banks or any of that. Then back to the wire fraud thing, a scheme to a fraud that may be a colloquial term, but it's a colloquial term that comes from this court's decision in Falkenberry and has the force of law. Fraudulent doesn't just mean illegal. It means obtaining property by means of lies. We have ten seconds. In all the talk about the day sheets, this fits under the medical practices section of the case, that again, there wasn't a doctor on trial. Whether the conduct was illegitimate with regard to filling out sheets in advance, prescribing medication to folks who had lied to the doctor and who may not have needed medication, all of that would have been proper in a case against the doctor, but I'm not sure that it has much place in the case against Mr. Sadler. Thank you. Okay, thanks to both of you for your helpful briefs and oral arguments. We really appreciate it. Mr. Dietrich and Mr. Brown, I see you're court-appointed counsel. I did a little of that myself before going on the bench, and I know how well you're paid, which there I do mean irony. Your clients are lucky, and thanks for your great work in this case. We really appreciate it. It's a service to the court. Okay, the case will be submitted, and the clerk may adjourn court. Thank you.